IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  14-cv-2475-WYD-KMT

STILLWATER MINING COMPANY,

     Plaintiff

v.

POWER MOUNT INCORPORATED,

     Defendant.

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

     This matter came before the Court on a bench trial on Claim 1 on February 7 to February 10, 2017.  Claims 2 through 5 have been bifurcated (*see* ECF No. 130), and are dependent on the outcome of Claim 1.  As ordered by the Court, the parties filed supplemental proposed Findings of Fact and Conclusions of Law on February 21, 2017. This Order represents my Findings of Fact and Conclusions of Law as to Claim 1 of the Amended Complaint.

     This case involves a complex series of commercial contracts and modifications thereto that were developed through significant negotiations between the Parties and played out across a decade-long course of performance and course of dealing. Stillwater argues that Power Mount's failure to deliver materials that Stillwater prepaid for entitles Stillwater to the return of the prepayments made.  Power Mount contends that Stillwater bore the risk of loss for its efforts to significantly increase its intake of

catalytic converters that it asked Power Mount to source, and thus Stillwater is not entitled to the return of the prepayments.

FINDINGS OF FACT

A. <u>Stipulated Findings of Fact</u>[1]

1.  Plaintiff Stillwater is a mining and recycling company, headquartered in Colorado, with most of its operations in Montana.

2.  Defendant Power Mount is small, family-owned company based in Somerset, Kentucky.

3.  Part of Stillwater's business is the recycling (through smelting and refining) of automotive catalytic converters to recover the precious metals—platinum, palladium, and rhodium—within them.

4.  Defendant Power Mount purchases automotive catalytic converters, decans those converters (i.e., opens the shell of catalytic converters to remove the catalyst), and sells the decanned catalyst to companies like Stillwater, which then extract the precious metals.

5.  Stillwater and Power Mount started their contractual relationship in 2003, with an agreement titled "Secondary Materials Processing Agreement" (the "2003 Contract").

6.  Under the 2003 Contract, Power Mount would send Stillwater decanned catalysts, and Stillwater would pay Power Mount for such materials in two installments:

---

[1] The parties submitted these facts through the Final Pretrial Order (ECF No. 153), filed on July 1, 2016.

the first when Stillwater accepted delivery of the decanned catalysts, and the second after Stillwater had determined the final value of the platinum, palladium, and rhodium ("Platinum Group Metals" or "PGMs") in the delivered catalysts.

7. In 2005, the parties entered into an agreement titled "Amended and Restated Secondary Materials Processing Agreement."

8. The biggest change between the 2003 Contract and the 2005 Restated Contract is that under the 2005 Restated Contract, Stillwater could make a prepayment to Power Mount so Power Mount could use that money to purchase catalysts for sale to Stillwater.

9. As described in more depth below, Stillwater's payments followed a three tiered method, where: (i) Stillwater would first prepay roughly 50% of the value of the materials after it received a form from Power Mount in which Power Mount agreed to sell the materials to Stillwater; (ii) Stillwater would next prepay approximately 40% of the value of the materials after Stillwater received the materials; and (iii) Stillwater would pay the remaining approximately 10% after final confirmation of volume/value.

10. Although most of the transactions between the parties fell under this 50-40-10 model in 2008, the parties would also occasionally sell and purchase certain material under a 90-10 model, whereby Stillwater would prepay approximately 90% of the value of the materials after confirmation of shipment and pay the remaining approximately 10% of the value after a subsequent period of time.

11. With regards to the first prepayment of approximately 50%, which is the

subject of this lawsuit, the 2005 Restated Contract provides that Power Mount will send Stillwater a "Metal Purchase Form . . . wherein Power Mount will offer to Stillwater ounces of Metal . . . at a price to be determined by Stillwater and will provide Stillwater with the Estimated Delivery Date of the Secondary Materials containing such Offered Ounces."

12.     This Metal Purchase Form, set forth as Appendix A to the 2005 Restated Contract, explained that "Power Mount hereby agrees to sell and Stillwater hereby agrees to purchase the following Offered Ounces of Metal."

13.     The 2005 Restated Contract provided: "Power Mount shall not include on a Metal Purchase Form any Metal that Power Mount does not reasonably expect to deliver to the Facility within 60 days from the date of the Metal Purchase Form."

14.     Within one business day of receiving this Metal Purchase Form, Stillwater would make its first prepayment – the approximately 50% prepayment.

15.     Following Stillwater's receipt and acceptance of materials from Power Mount, Stillwater would pay approximately 40% of the value of the materials in a second prepayment, and then after a determination of the Final Lot Value, Stillwater would make a final payment of approximately 10%.

16.     Further, the 2005 Restated Contract sets forth that "Stillwater may elect to suspend or terminate prepayments to Power Mount at any time during this Agreement for whatever reason."

17.     Stillwater kept track of the outstanding first prepayments it made to Power

Mount in a spreadsheet, which it would send at least every two months to Doug Meece at Power Mount.

18.     Power Mount wanted this information from Stillwater as it was "important" to Power Mount and it "wanted to see how much were the prepayments outstanding."

19.     If there were errors in these prepayment outstanding spreadsheets, Power Mount would report such to Stillwater.

20.     Power Mount, however, neither found nor reported errors in the prepayment outstanding spreadsheets.

21.     The prepayment outstanding spreadsheet as of December 31, 2008, which Stillwater sent Power Mount on January 5, 2009, showed a "Total Prepaid Outstanding" of "$28,542,201."

B.  ADDITIONAL FINDINGS OF FACT

22.     The parties entered into the 2005 Agreement because Stillwater wanted to increase its shipments of spent auto-catalyst from Power Mount to 20 tons of PGM deliveries per day.

23.     Under the 2003 contract, Power Mount was delivering "probably consistently 5 to 7 tons per day."

24.      In a letter from Greg Roset, Stillwater's Vice President and General Manager, to Paul Meece, one of Power Mount's owners, dated March 8, 2005, Stillwater outlined the goals of the 2005 Agreement and the Parties' stated intentions as follows:

          "1. You want to 'put some money in your pockets'.

2. Power Mount is not in a position to place its business at risk from the cash flow requirements needed to expand its operations to the 20-ton per day level.
3. The 'competition' is stepping up their efforts to take business away from Power Mount.
4. Power Mount has been approached by at least two large decanners who are interested in developing a relationship.  Power Mount is not in position to take on the additional cash outlay to proceed with these decanners."

(Trial Ex. 20, at 1).

25.     The trial testimony of Doug Meece and the March 8, 2005 Letter from Stillwater indicate that the intent of the parties in drafting the 2005 Agreement was to avoid Power Mount having to expend or risk its own money in assisting Stillwater in ramping up its PGM recycling business to 20 tons of PGMs per day.  Stillwater recognized that Power Mount was not willing to "place its business at risk" by increasing the delivery volume because of the cash outlay required and resulting risk of non-delivery of which Stillwater was made aware.

26.     Greg Roset's trial testimony indicates that the concept of the First Prepayments, which is the mechanism by which the money was lost in this case, was Stillwater's idea, rather than Power Mount's idea.

27.     Stillwater's March 8, 2005 Letter also clarified that it was Stillwater's intent in the new agreement that Power Mount would not have any "risk" under the new, forthcoming First Prepayment structure, stating that "[b]y accelerating the prepayment for catalysts, the cash requirement for the expanded supply plus the existing supply would come from [Stillwater].  This would significantly reduce or even eliminate any

cash flow risk for Power Mount that [Stillwater] is aware of."  (Trial Ex. 20, at 2).

28.     Stillwater further clarified in the March 8, 2005 Letter that its intent for what would ultimately become the 2005 Agreement was to use its financial resources to help Power Mount aggressively grow the parties' market share of the PGM recycling business while minimizing any risk to Power Mount's business.

29.     The 2005 Agreement incorporated the "First Prepayment" concept that Stillwater proposed in its March 8, 2005 Letter to Power Mount.  During calendar year 2008, pursuant to the then-operative 2005 Agreement, Stillwater provided money to Power Mount, which was forwarded as "First Prepayments," so that Power Mount could collect catalytic converters from its suppliers to then break down and ship to Stillwater.

30.     Power Mount only received First Prepayments for materials that it "reasonably expected" to deliver, and it never guaranteed the delivery of any particular Lot.

31.     There is no evidence that during the negotiations that led to the 2005 Agreement that Stillwater expected that Power Mount would guarantee delivery, and nor did Stillwater expect that Power Mount would reimburse it for any lost First Prepayments.  Mr. Meece testified that no such discussions occurred, and nor would they have, in light of Stillwater's acknowledgment that Power Mount could not put its business at risk.

32.     There is no language in the 2005 Agreement that places the financial risk of lost First Prepayments on Power Mount.  There are no guarantees, no loan

agreements, or lines of credit extended by Stillwater that could have created a debt obligation for Power Mount.

33.      Mr. Meece also testified that Stillwater never inquired with Power Mount whether Power Mount had the financial ability to underwrite or guarantee the repayment of the First Prepayments and that he made Stillwater aware of the potential risk that Power Mount's collectors may not deliver the promised catalytic converters after receiving the First Prepayments.  Mr. Meece testified that Power Mount only filled out a metal purchase form if Power Mount reasonably expected to delivery PGM materials to Stillwater.

34.      Stillwater and Power Mount did approximately $650 million dollars of business together between January 1, 2009 and early 2014.

35.      The "shortfall" in delivered ounces at issue in this case, approximately $28.5 million, was only about 4% of the Parties' business for shipment of PGM ounces from Power Mount to Stillwater during 2008.

36.      From testimony and evidence at trial, I find that there are no contractual provisions in the 2005 Agreement that place the risk of loss of the First Prepayments with Power Mount.  Section 9.4 of the 2005 Agreement, as Stillwater eventually conceded in Closing Argument, was intended only to reconcile outstanding amounts owed on delivered Lots.

37.      The March 8, 2005 Memorandum from Stillwater to Power Mount explained that "[b]y accelerating the prepayment for catalysts, the cash requirements for

the expanding supply plus the existing supply would from [Stillwater]."  Mr. Meece testified that he explained the risks of the First Prepayments to Stillwater including the risk of non-delivery.  Thus, it was implicit in the 2005 Agreement in light of the parties' collective and stated intent that Power Mount advance Stillwater's money to downstream suppliers notwithstanding the risk of non-delivery, a risk that Stillwater assumed.

38.     Stillwater's former Chief Executive Officer, Francis McAllister, testified by video deposition at trial that Stillwater was taking the risk with its "eyes wide open" to increase the amount of materials that would eventually be shipped by Power Mount to Stillwater's facility.  Similarly, Stillwater's General Counsel at the time testified as follows: "In perfect hindsight, there was a risk and we did take that risk."

39.     Stillwater filed its 2007 Annual Report and 10-K with the SEC and explained that the First Prepayments to Power Mount were fully at risk.  The 2007 Annual Report and 10-K provided, in pertinent part:

> "Under these sourcing agreements, [Stillwater] advances cash for purchase and collection of these spent catalyst materials.  These advances are reflected as advances on inventory purchases on the balance sheet until such time as the material has been received and title has transferred to [Stillwater].  *However, until the material has been procured, a portion of the advances are unsecured and the unsecured portion of these advances represents a substantial share of the total amount advanced.  This unsecured portion is **fully at risk** should the supplier fail to deliver material as promised or experience other financial difficulties.  Any determination that a supplier is unable to deliver the promised material or otherwise repay these advances would result in a substantial charge against earnings.*"

(Trail Ex. A4, at A4-067) (emphasis added).

40.     At one point during 2008, the outstanding balance on the First Prepayments was approximately $50 million.

41.     From July to December of 2008, Stillwater drafted numerous internal emails that demonstrated approval from Stillwater's executive team for additional First Prepayments to Power Mount even though the outstanding balance was in the tens of millions of dollars.

42.     At no point during 2008 did Stillwater ever demand that Power Mount repay the outstanding balance of First Prepayments.

43.     Consistent with this testimony, I find that Stillwater made no effort in 2008 to attempt to shift the risk of loss of the First Prepayments to Power Mount or hold it financially responsible in any manner.

44.     While the 2005 Agreement was still operative, after the financial crisis of 2008 and after the alleged losses occurred, the parties continued doing business together and Stillwater sent at least thirteen revisions to the 2005 Agreement to Power Mount between December 24, 2008 and September 28, 2012, altering the payment terms and other critical terms of the 2005 Agreement without once mentioning the alleged outstanding First Prepayments of $28.5 million nor that Power Mount owed Stillwater any outstanding debt, or that Power Mount was expected to repay Stillwater.

45.     Twelve of the thirteen revisions to the 2005 Agreement were drafted by Stillwater's Vice President and General Counsel at the time, John Stark, who testified by

videotape.

46.     The thirteenth revision to the 2005 Agreement was drafted by Stillwater's Chief Financial Officer at the time, Greg Wing.

47.     Not once in those thirteen modifications to the 2005 Agreement did Stillwater ever raise the now-claimed $28.5 million shortfall, nor did Stillwater ever request repayment of any of the lost First Prepayments totaling $28.5 million.

48.     In these revisions, the parties terminated the First Prepayment structure and moved forward on a "90/10" payment basis where Stillwater only sent money to Power Mount when material arrived at Stillwater's Columbus, Montana facility.

49.     The June 1, 2009 revision letter from Stillwater to Power Mount is the first letter after the 2008 financial crisis and it changed the terms of the 2005 Agreement as follows:

> "50% Prepayments – All future 50% prepayments under section 9.2 will be terminated
>
> 90/10 Payments – All material received and accepted from Power Amount will be subject to the 90/10 payment structure.  Stillwater will pay 90% of the estimated dollar amount due to Power Mount after final assays are determined (approximately 35 calendar days after receipt and acceptance)."

(Trial Ex. 30).

50.     The June 1, 2009 revision letter was followed by at least ten more letters from Stillwater to Power Mount, all of which contained the above language and none of which ever mentioned the $28.5 million in alleged outstanding First Prepayments.

51.     There was no documentary evidence that Stillwater ever asked Power

Mount to repay the $28.5 million shortfall related to the First Prepayments. Moreover, John Stark's testimony that writings were not preferred by Power Mount is not credible because it is implausible that a publically traded company like Stillwater would not, over a period of several years, even once reduce to writing its efforts to collect what it now characterizes as a substantial debt of $28.5 million.

52.    There is no evidence that Stillwater ever issued a writing either internally or to Power Mount stating that Stillwater believed Power Mount was responsible or liable for the $28.5 million shortfall.

53.    Trial testimony established that Stillwater never sent Power Mount a notice of a breach under Section 12.2 of the 2005 Agreement, and also that Stillwater never sent Power Mount a notice of an Event of Default pursuant to Section 13.2.

54.    The evidence is uncontested that Stillwater did not issue a single demand letter to Power Mount related to any aspect of the parties' business relationship prior to filing this lawsuit in September of 2014.  There was no contemporaneous evidence of any expressed need for re-payment, a payment plan, or any form of a plan to deliver the shortfall to Stillwater until this lawsuit began.

55.    I disregard the testimony of Mr. Stark who stated that Stillwater could not document its collection efforts or demands to Power Mount because of the business culture of Power Mount.  To the contrary, I find that a more plausible inference is that it was never Stillwater's intent to hold Power Mount responsible for this shortfall given (i) the lack of any indication in the 2005 Agreement that Power Mount would be

responsible for the loss of any First Prepayments; (ii) the importance of the parties' business relationship; (iii) Stillwater's continuing need to grow the PGM recycling business; and (iv) its recognition in March of 2005 that Power Mount did not have the financial resources to guarantee or repay the First Prepayments if a loss occurred.

56.     Importantly, James Binando, Manager of Metal Sales and Trading at Stillwater, testified that he did not recall ever telling Power Mount that Stillwater was going to sue Power Mount for the alleged shortfall in PGM ounces.

57.     There was no credible evidence that Stillwater ever expressed to Power Mount that it ever intended to seek recourse for the lost Prepayments before this lawsuit was filed.

58.     Stillwater management authored a December 31, 2008 internal memorandum that explained the reasons why the $28.5 million shortfall developed. (*See* Trial Ex. A2).  The December 31, 2008 memorandum does not state that Power Mount is responsible or liable for the losses, and it does not recommend that Stillwater sue Power Mount for the alleged shortfall, or that Stillwater would hold in abeyance any collection efforts.

59.     In the December 31, 2008 memorandum, Stillwater again explained that it was taking the risk in issuing the First Prepayments in light of the profitability of the recycling business generated by the First Prepayments.  (*See* Trial Ex. A2, at A2-002) ("…Stillwater recognized the risks inherent in its advances to Power Mount… Management consistently concluded, however, that the profitability of the business

more than justified the exposure.").

60.     Stillwater acknowledged that Power Mount had forwarded all of the First Prepayment monies to its own suppliers who were not shipping PGM material to cover the $28.5 million in First Prepayments.

61.     In its 2008 Annual Report outlining its financials, Stillwater wrote down (took an "impairment charge") of $26.0 million related to 50% First Prepayment monies it advanced to Power Mount in 2008.

62.     Stillwater's Controller, Rhonda Ihde, testified that in subsequent years Stillwater wrote down the remaining $2.5 million of the $28.5 million it sought in this lawsuit.  Ms. Ihde also confirmed that Stillwater wrote down $26 of the $28.5 million in 2008.

63.     In 2007 and 2008, Stillwater's mining business lost money, but its PGM recycling business was profitable.  Mr. McAllister explained that if the mining business was losing money, the only profitable business to Stillwater was recycling.

64.     In 2008, the Stillwater PGM recycling business gained a profit of approximately $10.87 million even after taking a $26 million write down related to First Prepayments to Power Mount.  (*See* Trial Ex. A17).

65.     In 2007, the Stillwater PGM recycling business gained a profit of approximately $25.799 million.

66.     In the years after the shortfall, 2009 through 2013, Rhonda Ihde testified that Stillwater recorded income before taxes on its PGM recycling business as follows:

2009: $6.4 million

2010: $11.475 million

2011: $18.816 million

2012: $10.452 million

2013: $35.463 million.

67.     The evidence is clear that the parties' business relationship continued successfully from 2003 until June of 2014, with the exception of the shortfall that occurred in 2008, which was driven solely by the market downturn, which neither party anticipated during the negotiations that preceded the 2005 Agreement.

68.     In light of expressed assumption (and shareholder and SEC disclosures) of the risk by Stillwater and the concomitant profitability of the recycling business, Doug Meece's testimony that Stillwater never asked Power Mount to pay Stillwater for the shortfall related to the 2008 financial crisis while the parties did business from the fall of 2008 through June of 2014 is consistent with the expressed intent of the parties in the pre-contractual negotiations and the surrounding circumstances of this business relationship.  Moreover, I find that Mr. Meece's testimony is consistent with parties' intent that is implicit in the 2005 Agreement, which does not allocate the risk of loss of Prepayments to Power Mount.

69.     From 2009 until the 2012 Agreement was executed on November 1, 2012, Doug Meece and James Binando both testified that Stillwater never once attempt to use the reconciliation provision in Section 9.4 of the 2005 Agreement to recoup any of the

$28.5 million shortfall.

70.     The testimony from Doug Meece and Greg Roset made clear that the Parties' business relationship terminated in August 2014 for reasons unrelated to the alleged $28.5 million shortfall.

71.     Greg Roset testified that after that meeting in August of 2014 when the Power Mount relationship with Stillwater appeared to be ending, Mr. Roset, Mr. Binando, and Mr. Dave Shuck decided that Stillwater should sue Power Mount based on the shortfall from 2008.

72.     Mr. Roset testified that during his routine business meetings with Power Mount he did not recall anyone from Stillwater talking to anyone from Power Mount about the alleged shortfall from 2008 and he did not recall any meetings related to Stillwater filing a lawsuit against Power Mount.

73.     Mr. Roset also testified that the first time he discussed with anyone from Stillwater the idea of suing Power Mount for the alleged 2008 shortfall was in 2014.

74.     Dave Shuck of Stillwater testified by video deposition and testified that in the meetings he attended with Power Mount, he does not recall anyone from Stillwater threatening to sue Power Mount for the alleged shortfall in PGMs.

75.     Mr. Shuck also testified that in the meetings he attended with Power Mount from late 2008 or 2009 forward, he did not recall anyone from Stillwater ever telling Power Mount that they owed money to Stillwater.

76.     No member of the current Stillwater executive team (i.e., CEO, CFO, and

General Counsel) testified at trial or in deposition.  No member of the current Stillwater executive team (CEO, CFO and General Counsel) was present during the negotiations of the 2005 Agreement or during the time in which that agreement was operative, or during which the subsequent agreements were negotiated, and consequently none of them has any personal knowledge of the facts underlying this lawsuit.

77.     The 2005 Agreement was subsequently replaced by a 2012 Agreement and then a 2013 Agreement.

78.     Neither the 2012 nor the 2013 Agreements mentions the recent allegation that Power Mount owes more than $28 million to Stillwater for alleged First Prepayments that were uncontrollably lost during the 2008 financial crises and falling PGM market.  Nor was there any reference to repayment or a continuing debt owed by Power Mount.

79.     When the 2005 Agreement was negotiated, it was clear that Stillwater recognized Power Mount's concern about the risk to its business, and that the parties were in very disparate financial positions with Power Mount not having the ability to guarantee the return of the First Prepayments.

80.     I find that it is implausible that Stillwater was making "loans" of these First Prepayments to Power Mount.  The 2005 Agreement does not include a loan agreement or even characterize these First Prepayments as a loan, and there is no reference to collateral, guarantees, a line of credit, or any security.

81.     Importantly, there is no mention of any remedy or recourse against Power

Mount for the collection of this purported indebtedness nor for non-delivery of PGM materials that were never acquired using Stillwater's First Prepayments.

82.    Quite simply, the evidence of the parties' intent when viewed in light of the course of dealing and the surrounding circumstances suggests that Stillwater had written off the First Prepayments and explicitly elected to forego any likely futile collection efforts in order to continue doing business with Power Mount and growing its share of the recycling business.

83.    This is consistent with the parties' intent that these First Prepayments were never to be treated as a loan or debt to be repaid by Power Mount.

84.    In sum, there was no evidence presented concerning the pre-contractual negotiations between the parties, the 2005 Agreement itself, or the subsequent course of dealings including the execution of the 2012 and 2013 Agreements that Power Mount contractually or otherwise bore the risk of loss for these Prepayments.  To the contrary, the evidence presented demonstrated that Stillwater knowingly undertook the risk of loss of these First Prepayments, was advised of the risk of non-delivery, recognized that it could not "hedge" against such risk, and decided to proceed to benefit from these payments in spite of the risk, due to the profitability of this arrangement with Power Mount.

85.    The course of dealing and course of performance of the parties after this loss affirmed the meaning of the 2005 Agreement and Stillwater's interpretation of it when it took no measure to enforce any claimed right against Power Mount but instead

continued to do business with Power Mount for almost six years.  This extended and continuing business relationship validates that Power Mount never bore the risk of loss of these prepayments, and Stillwater's recognition of this fact.

86.     Power Mount detrimentally relied on Stillwater's silence and acquiescence for nearly six years.  For example, Doug Meece testified that Mr. Stark did not see a point in Power Mount suing its suppliers for the $28.5 million.  Similarly, Power Mount was continuing to reduce the outstanding First Prepayments but Stillwater stopped making such prepayments, thus eliminating Power Mount's ability to further reduce the alleged shortfall.

## CONCLUSIONS OF LAW

1.     To prevail on its claim for breach of contract, Stillwater must prove that Power Mount failed to perform an obligation contained in an existing contract.  *See Denver & Rio Grande R.R. Co. v. Iles*, 53 P. 222, 224 (Colo. 1898) ("From the foregoing it follows that, if the plaintiff fails to prove either the contract or its violation, his action fails."); *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 529 (Colo. App. 2011) (reiterating the long-standing elements of a breach of contract claim under Colorado law) (citation omitted).  Stillwater, therefore, bears the burden to prove that Power Mount breached an obligation contained in the 2005 Agreement that assigns Power Mount the risk of loss associated with the First Prepayment advances made to third-party suppliers.  The 2005 Agreement does not contain such an obligation, nor any related remedy for the return of First Prepayments.

2.      Thus, the question of law presented is which party bore the risk of loss in the 2005 Agreement for spent auto-catalysts that were never delivered to Power Mount after it dispersed the First Prepayments to third-party suppliers.  The text of the 2005 Agreement and the supporting courses of performance and dealing in the years after the shortfall occurred are dispositive despite Stillwater's argument that an implied remedy can be gleaned from the Uniform Commercial Code ("U.C.C.").

**A. <u>Breach of Contract</u>**

3.      As a threshold matter, I must resolve whether the parties intended that Power Mount would bear the risk of loss and financial responsibility for the hundreds of millions of dollars Stillwater issued in First Prepayments under the 2005 Agreement.  In interpreting the contract, I consider its meaning in light of (1) the text of the contract, (2) the Parties' course of performance, and (3) their course of dealing.  *See* Colo. Rev. Stat. Ann. §§ 4-2-208(2), 4-1-303 (providing that when they conflict, the text controls course of performance, and course of performance controls course of dealing).  Based on the evidence, each supports Power Mount's interpretation of the 2005 Agreement.

i.      <u>Risk of Loss</u>

4.      The 2005 Agreement does not contain a provision assigning the risk of loss relating to the First Prepayments to Power Mount nor any remedy that provided for the return of First Prepayments in the case of supplier default.

5.      The text of the 2005 Agreement, instead, makes clear that the parties intended to place risks on Power Mount only for materials it was able to acquire, and

that the pre-acquisition risks associated with First Prepayments remained with Stillwater.  As examples, each provision of the 2005 Agreement designed to put risk or liability on Power Mount is predicated on Power Mount's possession of materials: (1) the Risk of Loss provision in § 4.2 puts the risk of loss on Power Mount for materials shipped to Stillwater up to the point of delivery; (2) in § 4.3, Power Mount's warranties are limited to materials "upon purchase"; (3) and the reconciliation provision in § 9.4 provides for an offset of Final Payments based solely on Lots delivered to Stillwater. *See* Trial Ex. 2, at 5, 6, and 9 – 10.  Each of these provisions supports the interpretation that Power Mount accepted only risks that were triggered once it obtained possession of converters from third-party suppliers, not before, and that the Agreement was carefully drafted to protect Power Mount from the risks associated with the First Prepayments. No provision of the 2005 Agreement is inconsistent with that position.

6.     Stillwater contends that the failure to deliver ounces listed on the Metals Purchase Form is the breach.  Both § 3.1 of the 2005 Agreement and the operation of the prepayment system generally, reflect that the metals on the Metals Purchase form were the metals Power Mount "reasonably expected" to deliver to Stillwater.  As Mr. Meece testified, and as is plain from the Agreement itself, the ounces on the Metals Purchase Forms were not yet acquired.  Those totals provided the value-basis for the 50% First Prepayment Stillwater would make so that Power Mount could attempt to acquire and deliver the metals.  There is no testimony or evidence in the record to contradict Mr. Meece's testimony that he reasonably expected to deliver the ounces

related to the "shortfall," but for the collapse of the metals market in 2008, when suppliers refused to deliver paid-for materials. The touchstone of § 3.1 is reasonableness of the expectation – not a guarantee that spent auto-catalysts would be delivered. Thus, § 3.1 does not shift the risk of loss of the First Prepayments to Power Mount.[2]

7. Furthermore, the parties' intent is clear from the extensive negotiations over the formation of the 2005 Agreement. As Doug Meece testified, Power Mount was concerned about the risks to its business in having responsibility for the massive cash outlays it took to acquire 20 tons of spent auto-catalyst per day and "that Power Mount was not in a position, not willing or able to risk its business to be able to take on the volume required to get to that 20 ton[s] per day." *See* Findings of Fact ¶ 25.

8. Mr. Roset's 2005 Memorandum to Power Mount outlined the negotiations, including Power Mount's concerns over the risks associated with the increased volumes Stillwater desired, and assured Power Mount that Stillwater would "significantly reduce or even eliminate" those risks. *See* Trial Ex. 20, at 1 – 2. And, as Mr. Stark testified with respect to advancing millions of dollars in unsecured prepayments to Power Mount, "[i]n perfect hindsight there was a risk and we did take that risk." *See* Findings of Fact ¶ 38.

9. Power Mount's interpretation is also supported by Stillwater's pre-shortfall

---

[2] The U.C.C. recognizes that parties may allocate or divide risk. Colo. Rev. Stat. Ann. § 4-2-303. The comments to that section make clear the parties may allocate risks "as they desire." *See id.* at cmt. 1. The context of the 2005 Agreement reflects a deliberate allocation of risk away from Power Mount as is contemplated by the U.C.C.

statements in both the Wing Memo (Trial Ex. A2) and its 2007 Annual Report (Trial Ex. A4). In 2007, Stillwater told the SEC and the public markets that the prepayments were "fully at risk." *See* Trial Ex. A4, at A4-067. Importantly, the "risk" referenced was associated with the "reliance on third-parties for sourcing of recycling materials" and the potential failure of those suppliers to deliver paid-for materials. *Id.* The Wing memo confirms that Stillwater believed these risks were worth the substantial reward. *See* Trial Ex. A2, at A2-002. There is not any contemporaneous documentary evidence supporting Stillwater's assertion that Power Mount accepted or that Stillwater intended for Power Mount to accept the risk of third-party supplier default, and the text of the contract expressly limits Power Mount's risk to those relating to delivered materials.

      ii.   <u>Course of Performance</u>

10.    When interpreting an agreement under U.C.C. Article 2, a party's failure to object in the face of an alleged breach is "the best indication of what [the] meaning was":

> (1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance . . . *any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.*

Colo. Rev. Stat. Ann. §§ 4-2-208(1) (emphasis added); cmt. 1. The "course of performance is always relevant to determine the meaning of the agreement." *Id.* at cmt. 2.

11.    Thus, Stillwater's silence regarding, and acquiescence to, any alleged

breach gives meaning to the 2005 Agreement, reflecting the parties' intention not to allocate the risk of loss with respect to the First Prepayments to Power Mount. As a primary example, under § 12.2 of the 2005 Agreement, Stillwater was required to provide Power Mount written notice (in conformance with § 18.3) of an alleged breach of the Agreement and an opportunity to cure. *See* Trial Ex. 2, at 12, 15 – 16. At trial, Stillwater's corporate representative, James Binando, could not identify a written notice of the breach or a demand letter that was sent to Power Mount before this suit was filed almost six years after the shortfall occurred fact. Not only does the lack of a written demand defy common sense if Stillwater actually believed Power Mount was responsible, that silence in the face of a contractual notice obligation is evidence of recognition that Stillwater did not believe it had a contractual right against Power Mount.

12.     Mr. Roset, Mr. Shuck and Mr. Binando testified that they never heard anyone from Stillwater explain to Power Mount that Stillwater may sue Power Mount. In fact, Mr. Roset testified that it was only when he, Mr. Binando and Mr. Shuck were in a car after a failed business meeting with Doug Meece in August 2014 that they planned to sue for the $28.5 million shortfall. No contemporaneous documentary evidence reflects that Stillwater told Power Mount for six years after the shortfall developed that it had to repay outstanding First Prepayments or informed Power Mount it was contemplating a lawsuit.

13.     Moreover, it is undisputed that Stillwater continued to do millions of dollars in business with Power Mount even after the "shortfall"—it continued to accept Power

Mount's delivery of PGM materials and continued to advance millions to acquire materials.  In fact, Stillwater did not invoke any contractual remedy it alleges to have had against Power Mount until it filed this lawsuit.  That is precisely the conduct § 4-2-208 emphasizes as definitive of the meaning of a contract, because it reflects the absence of any contractual right of recourse against Power Mount for the "shortfall" in the 2005 Agreement.[3]  Any purported unexpressed intent on the part of Stillwater to preserve its claimed contractual right to sue for the "shortfall" is unsupported by contemporaneous documentary evidence and is not consistent with its failure to take any action to preserve its now-claimed rights.

   iii. <u>Course of Dealing</u>

   14. As is plain from the 2012 and 2013 Agreements, there is no any reference to a supposed $28.5 million "debt" or "loan" owed by Power Mount at the time those agreements were formed.  *See* Trial Exs. 3, 4.  In fact, in § 15 of both contracts, the parties expressly disclaimed the presence of any outstanding obligations not reduced to writing: "Each Party shall be responsible only for its obligations as herein set out and shall be liable only for its share of the costs and expenses provided herein."  *See* Trial Exs. 3, 4 at 13.  It is inconceivable for Stillwater to now assert that it somehow preserved its right to collect the shortfall as this language excludes any undisclosed

---

[3] In *U.S. for the Use and Benefit of Trans-Colorado Concrete, Inc. v. Midwest Const. Co.*, Judge Kane invoked § 4-2-208 where a party had paid for eight months, without objection, certain transportation costs sought in the litigation. 653 F. Supp. 903, 907 (D. Colo. 1987). Judge Kane concluded under § 4-2-208 that the repeat performance under the contract—payment of transportation costs—was sufficient acquiescence to prevent the plaintiff from relying on the contract to recover those amounts. *Id.*

obligations in these Agreements.

15.    In addition, the parties continued their performance between 2009 and 2014 under the 2005, 2012, and 2013 Agreements without any objection by Stillwater based on the existence of a purported outstanding "debt" of $28.5 million.  Stillwater also never invoked any contractual remedies, such as the offset right it claimed existed in § 9.4, during the course of any of the four contracts between the parties.  Thus, Stillwater's conduct, and the course of dealing as a whole, is inconsistent with its interpretation.

16.    The lack of such a risk allocation to Power Mount in the 2005 Agreement was not an oversight of the Parties; the evidence suggests it is a *hallmark* of that contract, reflecting that Power Mount could not and was not willing to guarantee third-party suppliers would not default.  The Court, therefore, concludes that Power Mount did not breach any obligation contained in the 2005 Agreement.

**B.  U.C.C. Remedy Under C.R.S. § 4-2-711**

17.    At trial, Stillwater relied on Section 9.4 of the 2005 Agreement despite the Court's ruling in its Order Denying Summary Judgment issued on August 16, 2016 (*see* ECF No. 156), that § 9.4 does not "require the return of the entire prepayment amount in the event of Power Mount's failure to deliver materials."  (*See* ECF No. 156 at 10).  Notably, Plaintiff did not plead the U.C.C. or any form of breach of implied obligation, and it abandoned § 9.4 in closing argument.  Stillwater now asserts the existence of a

remedy in Part 7 of Article 2 of the U.C.C., which I reject.[4]

       i.   <u>C.R.S § 4-2-711 Does Not Create an Obligation</u>

18.     C.R.S. Section 4-2-711(1) provides that, as a remedy for a "breach [that]
goes to the whole contract (section 4-2-612)," a buyer may, among other things, recover
"so much of the price as has been paid."  In referring to a breach of the whole contract,
§ 711(1) cites to § 4-2-612, which defines the concept of a whole breach:

> (1) An "installment contract" is one which requires or authorizes the
> delivery of goods in separate lots to be separately accepted, even
> though the contract contains a clause "each delivery is a separate
> contract" or its equivalent.
>
>               * * *
>
> (3) Whenever nonconformity or default with respect to one or more
> installments substantially impairs the value of the whole contract
> there is a breach of the whole, but the aggrieved party reinstates
> the contract if he accepts a nonconforming installment without
> seasonably notifying of cancellation or if he brings an action with
> respect only to past installments or demands performance as to
> future installments.

Colo. Rev. Stat. Ann. §§ 4-2-612(1), (3) (emphasis added).

19.     Stillwater did not dispute at trial that the value of the "shortfall" constituted
only a small fraction of the business the Parties conducted in 2008, approximately 4%,
and less so over the course of the entire life of the 2005 Agreement.  Stillwater cannot
credibly argue that such a proportionally small shortfall constitutes a "breach [that] goes
to the whole contract," as its substantial profits bear out.  Section 4-2-711 simply does

---

[4] In order to have recourse to the remedies in Part 7 of the U.C.C., Stillwater must prove a breach under Part 6 under
the U.C.C.  Stillwater cannot bootstrap an implied remedy from the U.C.C. as proof of a breach of a non-existent
obligation under the 2005 Agreement.  Stillwater has put the cart before the horse by *presuming* a breach of the 2005
Agreement in its attempt to remedy a $28.5 million loss that it was content to take a chance on due to the massive
profits it obtained.

not apply to provide a remedy for the return of the First Prepayments under these circumstances.

20.     The *Danburg v. Realties, Inc.* is inapplicable.  677 P.2d 439 (Colo. App. 1984).  In *Danburg*, the plaintiff made a "deposit" of $10,000 to the defendant, who was to acquire furniture for the plaintiff's Colorado cabin.  *Id.* at 440 – 41.  When the defendant did not acquire any furniture, the plaintiff sought the return of the deposit.  *Id.* In upholding the trial court's decision to award the plaintiff his deposit as a remedy for a breach of the oral contract, the Colorado Court of Appeals held that the record supported the finding that "the contract provided that defendant corporation had a duty to refund the $10,000 deposit in the event it purchased no furnishings for plaintiff."  *Id.* at 441.  Thus, the agreement at issue in *Danburg* contained exactly the concept that the 2005 Agreement lacks—a provision that calls for a return of the First Prepayments if PGMs were not acquired by Power Mount.  Such a provision would have been simple to include if that were actually the parties' intent, and its absence is indicative of the meaning of the 2005 Agreement.

21.     *Danburg* is not analogous, and none of the cases cited by Stillwater in its closing argument provides that a U.C.C. remedy may be implied as a means to *create the very obligation that it seeks to prove was breached.*  *See e.g., Wilson v. Hayes,* 544 S.W.2d 833, 834 (Tex. App. 1976) (simple "used uncleaned bricks" delivery case where the holding is predicated on a breach of an oral contract—no breach present is here, plus a complex, written Secondary Materials Processing Agreement was in place);

*Yorgo Foods, Inc. v. Orics. Indus., Inc.,* 2011 WL 4549392 (D.N.H. Sept. 29, 2011)

(Plaintiff issued a contract termination letter and immediately sought repayment of its

deposit on fast food machine after terminating the contract); *US v. Winstar Corp.*, 518

U.S. 839, 869 n.15 (1996) (Financial Institutions Reform, Recovery, and Enforcement

Act of 1989 (FIRREA) Case where the footnote discussed intended remedies—here,

the parties negotiations expressly indicate no intended remedy against Power Mount for

lost First Prepayments).  Each case cited by Plaintiff is meaningfully distinguished by

the various Second Materials Processing Agreements at issue here, the attendant

course of dealing, and stark differences in the buyer-seller arrangements.  C.R.S. § 4-2-

711 is inapplicable and does not provide a basis for Stillwater to recover.

       ii.   <u>Court will not Imply any Obligation for Power Mount to Return the First</u>
            <u>Prepayments</u>

    22.     Even if I were inclined to import an obligation from the U.C.C. or

elsewhere in law, doing so would not be in accordance with the intent of the Parties,

and contracts must effectuate the intentions of the parties rather than serve as a vehicle

for a court to correct a bad bargain.  *See Fox v. I-10, Ltd.*, 957 P.2d 1018, 1022 (Colo.

1998) ("'[C]ourts do not make contracts for parties' and 'do not open their doors to those

that are suffering merely from their own bad bargains'") (quoting *Gertner v. Limon Nat'l*

*Bank*, 257 P. 247, 257 (Colo. 1927)).

    23.     As Doug Meece testified at length, Power Mount did not intend to and

could not accept the risks associated with hundreds of millions of dollars of First

Prepayments advanced to downstream suppliers whose performance it could not police or assure. And the Roset Memorandum reflects that Stillwater understood and sought to address those concerns in the 2005 Agreement. *See* Trial Ex. 20. In addition, the text of the 2005 Agreement demonstrates that the parties intended that no obligations would be implied: (1) the parties expressly integrated the 2005 Agreement in § 14, (2) they limited the parties' obligations to only those set out in the Agreement in § 15, and (3) they disclaimed any implied covenants (other than the required obligation of good faith and fair dealing) in § 17. *See* Trial Ex. 2, at 13 – 15. The parties' intent to limit their obligations to those expressly set out in the contract is manifest.

24.     Finally, as the Tenth Circuit has recognized, courts do not imply obligations related to terms that are expressly addressed in the contract at issue. *See Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1114 (10th Cir. 2005) (recognizing there are no implied covenants when the subject matter is addressed in contract) (citing *Continental Potash, Inc. v. Freeport-McMoran, Inc.*, 858 P.2d 66, 80 (N.M. 1993)). The parties allocated post-delivery risks of the spent auto-catalysts as in in § 4.2 of the 2005 Agreement, consistent with Power Mount's stated inability to guarantee the First Prepayments or third-party performance. Stillwater knew and accepted the risk of non-delivery, and the Court will not imply an obligation that alters that express allocation.

25.     Thus, neither the U.C.C. nor any other form of implied obligation provides a legal basis for holding Power Mount responsible for the outstanding First

Prepayments.

## C. **Equitable Defenses**

26.     Regardless whether there was a breach, which I held above that there was not, the evidence convinces me that equity favors excusing Power Mount from having to now repay a six-year-old alleged "debt" of $28.5 million that Stillwater slept on—while it continued to profit from Power Mount's performance—until the final days before the six-year statute of limitations ran.  Power Mount's affirmative defenses provide legitimate grounds for excuse and warrant a judgment in its favor.

### i.     Estoppel and Quasi-Estoppel

27.     There are multiple forms of defensive estoppel that serve the ends of justice by preventing a party from benefitting from an unjustified silence or from inconsistent positions.  For example, the doctrine of quasi-estoppel "applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit."  *Obermeyer Hydro Accessories, Inc. v. CSI Calendering, Inc.*, 158 F. Supp. 3d 1149, 1170 (D. Colo. 2016) (quoting *Clark v. Cotten Schmidt, L.L.P.*, 327 S.W.3d 765, 770 (Tex.App. 2010)); *see also Fallon v. Worthington*, 22 P. 960, 963 (Colo. 1889) (Colorado courts have long recognized quasi-estoppel where "a party has changed his position through the failure of another to exercise a right which he might have exercised.").  Quasi-estoppel "forbids a party from accepting the benefits of a transaction...and then subsequently taking an inconsistent position to avoid corresponding obligations or effects."  *Obermeyer*, 158 F.

Supp. 3d at 1170 (quoting *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex. App. 1994)).  It does not require a showing of detrimental reliance.  *See Obermeyer*, 158 F. Supp. 3d at 1170 ("Unlike equitable estoppel, quasi-estoppel requires no showing of misrepresentation or detrimental reliance.") (citation omitted).

28.　It is undisputed that Stillwater substantially profited from the 2005 Agreement, on the order of tens of millions of dollars.  In doing so, the evidence at trial reflects that, despite tracking outstanding advances, Stillwater did not notify Power Mount that an alleged breach of the 2005 Agreement had occurred.  Stillwater is quasi-estopped due to its silence, its acceptance of the benefit of the bargain, and its late attempt through this case to avoid one bad quarter of a decade-long profitable venture.

29.　Another form of defensive estoppel in the context of contract law prevents a party from arguing a particular interpretation of a contract that a party delayed too long in adopting.  *See Extreme Const. Co. v. RCG Glenwood, LLC*, 310 P.3d 246, 251-52 (Colo. App. 2012) (Estoppel can "preclude a party from contesting a particular interpretation of [a contract] provision….").  "There are few principles of contract law better established, or more uniformly acknowledged, than the rule that when a contract not fully performed on either side is continued in spite of a known excuse, the right to rely upon the known excuse is waived."  *Id.* at 253 (quoting 13 Richard A. Lord, *Williston on Contracts* § 39:31, at 639 (4th ed. 2000)).  Stillwater's delay and silence, considered in light of its position at trial that it had contractual rights against Power Mount, served merely to induce Power Mount to continue to perform under the 2005 Agreement, and

then under the 2012 and 2013 Agreements, to Stillwater's substantial benefit.

30.     This form of estoppel requires a showing of detrimental reliance.  *Id.* at 252.  The evidence at trial supports a finding that Power Mount relied to its detriment on Stillwater's silence.  Mr. Meece testified that (1) Stillwater did not instruct Power Mount to sue its suppliers to recover the outstanding First Prepayments, (2) Stillwater stopped the First Prepayment system despite Mr. Meece's testimony that he told Stillwater it would mean he could not reduce the shortfall further, and (3) Stillwater never provided Power Mount with the contractually required notice and corresponding opportunity to cure the alleged breach.  At bottom, Power Mount and Stillwater both moved on from the "shortfall," and Power Mount is now left in the detrimental position of being unable to take any meaningful steps to recover the outstanding advances some eight years after the fact.

31.     Ultimately, fairness and equity and commercial certainty demand relief for Power Mount in light of Stillwater's long-acquiescence and silence in the face of a contractual requirement to notify Power Mount that it breached the 2005 Agreement.  Instead, Stillwater elected to keep the profits from Power Mount's performance, and the Court will force it to live with its choice.  Thus, I apply these legal principles to estop Stillwater's attempt to recoup the $28.5 million "shortfall."

      ii.    <u>Laches</u>

32.     The Colorado Supreme Court recently addressed and reaffirmed the doctrine of laches as it relates to the legislatively prescribed limitation on contract

actions for a liquidated debt, and in doing so held that laches can shorten the statutory

limitations period:

> Since the early days of statehood, we have recognized that laches is available as a defense in some circumstances to shorten the period for filing a claim, even though the claim has been timely filed within a legislatively prescribed statute of limitations period. *Great W. Mining Co. v. Woodmas of Alston Mining Co.*, 14 Colo. 90, 23 P. 908, 911 (1890) . . . .
>
> * * *
>
> Despite that statute of limitations, we held that laches was still available as a defense. *Id.* In justifying use of laches, we explained that "[w]e cannot ... give this statute such a construction as will permit a party in all cases to stand idly by until the limitation of the statute has nearly run, and then claim that, by virtue of the statute, he is excused from the laches." *Id.* As explained in *O'Byrne*, "[p]articularly is this true where witnesses have died or their memories become dim or time and long acquiescence have obscured the nature and character of the [claim] or the acts of the parties or other circumstances give rise to presumptions unfavorable to its continuance." 212 P.2d at 871. *Great West Mining Co.* and its progeny demonstrate that, under Colorado's merger of law and equity, legislatively prescribed limitations periods do not ordinarily preclude a laches defense.

*Hickerson v. Vessels*, 316 P.3d 620, 624-25 (Colo. 2014) (remanding for consideration

of laches defense) (emphasis added) (citations omitted). "The essential element of

laches is unconscionable delay in enforcing a right under the circumstances, usually

involving a prejudice to the one against whom the claim is asserted." *Id.* at 623 (quoting

*Loveland Camp No. 83 v. Woodmen Bldg & Benevolent Ass'n,* 116 P.2d 195, 199 (Colo.

1941)).

33.     That Stillwater slept on its claimed rights for nearly six years and filed suit

just days before the expiration of the six-year limitations period is beyond dispute.

Equally apparent is the fact that "long acquiescence [has] obscured the nature and character of the claim." *Id.* At trial, the nature of Stillwater's claim was difficult to discern. The lack of documentary evidence to support Stillwater's interpretation, coupled with the many years of business that the parties undertook following the shortfall in the fall of 2008, underscore the applicability of laches in this case and justifies barring Stillwater from its pursuit of this aged and obscure breach of contract claim.

<u>CONCLUSION</u>

34. Based on the foregoing Findings of Fact and Conclusions of Law, I make two independent findings. First, I find that Power Mount is not liable to Stillwater under the 2005 Agreement for any lost First Prepayments based on the clear intent of the parties, the language of the 2005 Agreement, and the parties' courses of performance and dealing, which established that Power Mount never bore the risk of loss. Second, I find that even if such an obligation were to exist, Power Mount's breach is excused by two of its Affirmative Defenses, the equitable doctrines of quasi-estoppel and laches.

35. Accordingly, Final Judgment shall enter in Defendant Power Mount's favor on Claim 1 for Breach of Contract and that claim is **Dismissed With Prejudice**. Because the parties agree that Claims 2–5 would only be viable if Plaintiff Stillwater succeeded on Claim 1, Claims 2–5 are also hereby **Dismissed With Prejudice**.

Dated: April 13, 2017.

BY THE COURT:


/s/ *Wiley Y. Daniel*
WILEY Y. DANIEL,
SENIOR UNITED STATES DISTRICT JUDGE